PABST BREWING CO. v. CRENSHAW et al.

(Circuit Court, W. D. Missouri, St. Joseph Division. February 9, 1903.)

1. INSPECTION—MISSOURI BEER INSPECTION LAW—CONSTRUCTION.

In Act Mo. May 4, 1899 (Sess. Laws 1899, p. 228), providing for the inspection of beer and other malt liquors, section 5, which requires every person or corporation who shall receive for sale or offer for sale any beer or other malt liquors other than those manufactured in the state before offering the same for sale to notify the inspector, who shall inspect and label the same, etc., reasonably construed, has no application to the case where beer manufactured outside of the state is shipped through it for sale in another state, nor to such shipment into the state to a warehouse of the shipper used merely for convenience in distributing beyond the limits of the state.

2. SAME—VALIDITY—DISCRIMINATION AGAINST OUTSIDE MANUFACTURERS.

The provision of such act that beer made in the state and exported for sale outside of it shall be inspected without charge is one with which a foreign manufacturer has no concern, and does not create an illegal discrimination against him, the inspection fee being charged alike on all beer sold in the state, whether made therein or outside.

3. SAME.

The provision of section 5 of the act, which requires an affidavit from the manufacturer where beer made outside the state is brought therein for sale, showing that only certain ingredients are used in its manufacture, whereas no affidavit is required from domestic manufacturers, is not a discrimination against the foreign manufacturer of which he can complain or which renders the act invalid under the fourteenth constitutional amendment, but is a reasonable provision, inasmuch as it is impracticable for the state to make an actual inspection of the materials used where the manufacture is outside of the state, as it does in case of the domestic product.

4. SAME—CONSTRUCTION OF ACT.

The further provision of said section 5 that "upon receipt of said affidavit the inspector shall inspect and label the packages containing said beer or malt liquors," when given a sensible construction in connection with the other provisions of the section and the act, does not require nor authorize the inspector to open the packages and inspect the contents, but contemplates that the affidavit shall be accepted in lieu of an actual inspection, and that the inspector shall identify and label the packages covered thereby.

5. SAME—INTERFERENCE WITH INTERSTATE COMMERCE.

Such act, dealing as it does with liquors, which when shipped into a state as an article of interstate commerce are specially subjected to the police regulations of the state by the Wilson act of August 8, 1890 [U. S. Comp. St. 1901, p. 3177], cannot be *held* to impose an unconstitutional burden upon interstate commerce, because the fees for inspection fixed therein, which are paid into the state treasury, may amount to more than the cost of the inspection.

6. SAME—ERRONEOUS CONSTRUCTION OF STATUTE—INJUNCTION.

It is not within the police powers of a state to subject an article of interstate commerce passing through the state, or which may be temporarily stored therein for distribution to purchasers in other states, to exactions either in the way of taxes or inspection fees, and a bill

¶ 5. State laws interfering with interstate or foreign commerce, see note to McCanna & Fraser Co. v. Citizens' Trust & Surety Co., 24 C. C. A. 13.

by a manufacturer of beer in another state alleging that such inspection law is construed by the state officers to require the inspection of beer shipped into the state by complainant and there stored in its warehouses for convenience of distribution until it shall be there sold and forwarded in the original packages to the purchasers in other states, and that complainant is required under penalty of prosecution to pay the fees for such inspection, states a cause of action for an injunction.

In Equity.  On demurrer to bill.

This is a bill in equity to enjoin the defendants, G. Y. Crenshaw, as state beer inspector, and his assistant, from enforcing against the complainant, a corporation of the state of Wisconsin, the provisions of an act of the Legislature of the state of Missouri, entitled, "An act creating the office of inspector of beer and malt liquors of the state, and providing for the inspection of beer and malt liquors manufactured and sold in this state," approved May 4, 1899.  Sess. Laws Mo. 1899, p. 228.  The bill sets out the act, the substantive provisions of which are that it creates the office of beer inspector, to be appointed by the Governor of the state, and defines his duties.

Section 3 provides that every person or corporation keeping a brewery for the manufacture of beer or malt products within the state shall cause the same to be inspected by said inspector.  Section 4 requires that such malt liquor shall contain no other substances than pure hops, or pure extract of hops, or pure barley, malt, or wholesome yeast, or rice.  Section 5, which it is conceded has special reference to the beer or malt liquors manufactured without the state, provides, in substance, that every person or corporation who shall receive for sale or offer for sale any beer or other malt liquors other than those manufactured in this state shall, upon receipt of same and before offering for sale, notify the inspector, who shall be furnished with a sworn affidavit, subscribed by an officer authorized to administer oaths, from the manufacturer thereof, or other reputable person having actual knowledge of the composition of said beer or other malt liquors, that no material other than pure hops or the extract of hops, or pure barley, malt, or wholesome yeast, or rice, was used in the manufacture of the same; "upon receipt of said affidavit, the inspector shall inspect and label the packages containing said beer or malt liquors, for which services he shall receive like fees as those imposed upon the manufacturers of beer and malt liquors in this state."  Section 6 provides for the keeping of books and record of fees collected, and expenditures incurred, to be reported to the Governor of the state.  Section 7 makes it the duty of the inspector to cause to be inspected all beer or other malt liquors brewed, manufactured, or sold in this state, and, if found to come up to the requirements of the statute, he shall place upon the package containing such beer or malt liquor his label, certifying that the same has been inspected, and is made of wholesome ingredients.  Section 8 fixes the inspection fees at one cent for each gallon contained in each package, and two cents for labeling each package, which fees are to be paid into the state treasury.  The word "package" as used in the act shall mean any kind of vessel, other than pint and quart bottles, in which any beer or malt liquor may be placed for sale, containing eight gallons or less;  when said beer, etc., is placed in pint or quart bottles, a "package" shall be construed to mean not to exceed 48 pint bottles or 24 quart bottles, which, when manufactured and so bottled, must, before sale, be placed in suitable cases containing said number and size of bottles, for inspection and stamping by said state inspector; and when placed in vessels containing more than eight gallons, the word "package" shall mean each eight gallons or fractional part thereof so contained in said vessel.  Section 9 provides that the expense of said office, including the salaries of the inspector and his deputies, shall be paid monthly out of the amount appropriated by law from the general revenue fund; and all fees received by the inspector under the provisions of the act shall, on or before the last day of each month, be paid into the state treasury and placed to the credit of the general revenue fund.  Section 10 declares that any person who shall sell any beer or malt liquor within this state which has not been inspected

according to the provisions of the act, or contained in packages which shall not have upon them the certificate of the state inspector, etc., shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not exceeding $500, or by imprisonment in the county jail for a period not less than six months, and in addition thereto shall have his license or other authority, giving him the right to manufacture or sell said liquors in this state, revoked, and shall not again receive any such license or other authority for a period of two years. Section 12 provides that all prosecutions for violations and penalties under the provisions of the act shall be either by indictment or information in any court of competent jurisdiction. Section 13 declares that all beer or other malt liquors manufactured in this state and exported, outside of the state for sale shall be inspected as other liquors designated in this act, but said inspection shall be free of cost to the manufacturer.

The bill of complaint, in its substantive allegations, states that the complainant is a manufacturer, in the state of Wisconsin, of grades of beer and malt liquor, requiring special treatment; and that it ships into the state of Missouri, annually, not less than 15,000 barrels of beer and other malt liquors, of 30 gallons each, of the aggregate value of not less than $100,000; that it has a warehouse in the state of Missouri in which its beer is stored. About one-half shipped into the state is subsequently reshipped from its said warehouse and sold in other states. The bill states that a large number of persons are engaged in the manufacture of beer in the state of Missouri, a large quantity of which is for sale in the state and also for export therefrom; and that a very large quantity is also shipped into the state from other states and countries. It is charged that said act of the Legislature is in conflict with the Constitution of the United States, and is violative of the complainant's rights thereunder, and especially under the fourteenth amendment thereto. The bill then proceeds to set out, with considerable specification, the objections to the validity of the statute, which may be briefly stated as follows:

1. That the Act imposes upon the product of the importer into the state a greater exaction than upon the product of the manufacturer in the state, or is imposed upon the property of other persons in the state, and is, therefore, an unjust discrimination against the nonresident brewer; and is, therefore, in conflict with the fourteenth amendment and the interstate commerce clause of the federal Constitution.

2. That not less than 7,500 barrels, of 31 gallons each, of the value of $50,000, shipped into the state by the complainant, is intended for subsequent exportation to other states, and is sold and reshipped to other states in the original packages, although brought into the state and stored in complainant's warehouse; and that complainant is compelled to pay, and does pay, to the state, inspection fees upon that part of its product intended for other states, in violation of section 8 of article 1 of the Constitution of the United States.

3. That such inspection fees are not required to be paid on the beer manufactured in the state of Missouri and exported therefrom, while such fees are required on the beer manufactured outside of the state by complainant and shipped through Missouri into other states.

4. That while $12,000 is appropriated for the cost of inspection, and that as no part of this sum is paid by the manufacturers of beer in the state of Missouri upon their products exported for sale, an unjust proportion of these salaries is collected from the complainant.

5. That the act requiring the nonresident brewer to furnish an affidavit of the ingredients from which his beer is manufactured costs the complainant one thousand dollars annually, while the domestic manufacturers are not required to furnish such affidavits; and that when such affidavit is submitted it is of no force or effect, and does not take the place of an inspection. But that the act, nevertheless, requires in addition to such affidavit an inspection, which necessitates the breaking open of the packages in which the beer is contained, and that this will result in the destruction of at least one package of each shipment, as the beer in the bottle opened will become "stale, flat and unprofitable."

In one paragraph of the bill it is alleged, in terms, that a large per cent. of the beer shipped by the complainant is stored in this state, in the original packages, or bulk, temporarily, for distribution and sale outside of the state, without breaking the original packages; and that the defendants subject such to the demands of the state under said act to the inspection fees; that they have caused prosecutions to be instituted for violations of the act for refusals to pay such fees, and threaten further prosecutions, to the great annoyance of the complainant, attended with exposure to a forfeiture of its right to transact its business in the state; the particulars of which averment will more fully appear in the opinion of the court.

The defendants demur to the bill.

Harkless, O'Grady & Crysler and Francis C. Downey, for complainant.

Wm. M. Williams and E. C. Crow, Atty. Gen., for defendants.

PHILIPS, District Judge (after stating the facts). It is conceded to the complainant that the bill is not obnoxious to the objection that this is a proceeding against the state as such. It is directed against the defendants in their individual capacity, who, under color of their office as inspectors, are alleged to be enforcing a legislative act in contravention of the Constitution of the United States, and, therefore, such act affords them no protection as representing the state. Counsel for defendants at the hearing conceded this. The Supreme Court of the state, in State ex rel. Kenamore v. Wood, 155 Mo. 425, 56 S. W. 474, 48 L. R. A. 596, and State v. Bixman, 162 Mo. 1, 62 S. W. 828, has affirmed the validity of the statute in question under the Constitution and laws of the state. It held that the statute was not a revenue measure, as distinguished from a mere inspection fee or license under the police power of the state; that the manufacture and sale of intoxicating liquors in the state not being of the nature of a natural right, it is competent for the state, in permitting such occupation and business, to make such regulations and conditions therefor, in the interest of the public health of the people, as the Legislature, in the exercise of the police power of the state, may deem fit and proper to impose. No matter, therefore, what may be the opinion of this court respecting the correctness of that ruling, in so far as it rests upon the Constitution and laws of the state, it must adopt and follow such construction by the highest court of the state. Cargill Co. v. Minnesota, 180 U. S. 453, loc. cit. 466, 467, 21 Sup. Ct. 423, 45 L. Ed. 618. The important question, therefore, for the determination of this court is whether or not the act on its face, as applied to the instance and situation of this complainant, is in conflict with any of the supreme provisions of the federal Constitution.

The act in question does not impose upon imported beer any greater inspection fee than upon the domestic ·manufactured article. This being true, although the mode of ascertaining and collecting be different, being necessarily so, dependent upon a difference in circumstances, constitutes no discrimination, within the meaning of the Constitution, against the importer; and is not, therefore, an attempt at interference with the freedom and equality of interstate commerce. Hinson v. Lott, 8 Wall. 148, 19 L. Ed. 387.

The principal criticism by complainant's counsel is predicated of

sections 5 and 13 of the statute. A reasonable construction of section 5 does not justify the contention that it has any application to the instance of beer manufactured outside of the state and shipped through the state for sale in another state; nor to such shipment into the state to a warehouse—of the nature of an entrepot—of the shipper, used merely for convenience or eligibility for distribution beyond the limits of the state. The Supreme Court of the state, in State v. Bixman, supra (page 40, 162 Mo., page 838, 62 S. W.), clearly enough indicates that the state places no such construction on the act. The court said:

"The law exacts that every brewer, foreign as well as domestic, who sells in the state, shall pay the same inspection fees or price for the privilege of selling in this state, and shall submit to the same inspection; on the other hand, the law exempts all brewers who export from paying these fees."

The language of section 5 is:

"Every person, persons or corporation who shall receive for sale or offer for sale any beer or other malt liquors other than those manufactured in this state shall, upon receipt of same, and before offering for sale, notify the inspector," etc.

The clear intendment of this is that it has reference alone to beer received in the state for sale here. Where the language of a statute is such as to be reasonably referable to a subject-matter within the legal competency of the legislature to regulate, that interpretation should obtain which refers its import to a valid, rather than an invalid, act. "Nothing is better settled than that a statute should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion." Lau Ow Bew v. U. S., 144 U. S. 47, loc. cit. 59, 12 Sup. Ct. 517, 36 L. Ed. 340. This is predicated of the wise rule laid down in Plowden, 205:

"From which cases it appears that the sages of the law heretofore have construed statutes quite contrary to the letter in some appearance, and those statutes which comprehend all things in the letter they have expounded to extend to but some things, and those which generally prohibit all people from doing such an act they have interpreted to permit some people to do it, and those which include every person in the letter they have adjudged to reach to some persons only; which expositions have always been founded upon the intent of the legislature, which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances."

Does the fact that section 13 of the act exempts the domestic manufacturer from any fee for the inspection of beer to be exported by him outside of the state create an illegal discrimination against the foreign importer? If the state, in the interest of the public health, requires the domestic exporter to submit his product to inspection by the local inspector prior to the exportation, without fee, how does it concern the foreign manufacturer? The Missouri manufacturer shipping into another state for sale, like the Wisconsin exporter, is subject to the laws of the state where the sale is made, and must submit to such regulations as are imposed by the state where the product is to be consumed. It would be subject to the

police power of such state for regulation. After the complainant has shipped his product into the state for sale here, and the same is sold by him, it does not concern him what disposition his vendee may make of it, or what impediments or burdens his vendee may encounter in disposing of it. The inspection fee exacted by the statute being only on beer shipped hither for sale in the state, if the purchaser intends his purchase for sale in another state, he would not be subject to any local inspection fee in Missouri on the article in the original package in transitu to another state, or temporarily stored here for the convenience of foreign distribution. It is only when shipped here to become mingled with the common property of the state that it becomes amenable to the police laws of the state. In short, the complainant is in no position to complain of any discrimination as against him by the state until his product shipped hither is subjected to some police regulation or exaction not common to a like domestic product. The allegations of the bill in this respect will be discussed further on.

This brings us to the consideration of the objection, based on section 5 of the act, respecting the requirement that when a consignment is made for sale in this state the shipper is required to furnish the inspector "with a sworn affidavit, subscribed by an officer authorized to administer oaths from the manufacturer thereof, or other reputable person having actual knowledge of the composition of said beer or other malt liquors, that no material other than pure hops or the extract of hops, or pure barley, malt or wholesome yeast, or rice, was used in the manufacture of the same." The making of these affidavits by complainant, it is alleged, costs it annually about $1,000, whereas no such burden is imposed upon the domestic manufacturer. In construing this provision, regard must be had to the scheme of the police regulation of the state, which was, as held by the Supreme Court of the state, to protect the people against the use of unwholesome beer. To this end, all the beer sold for consumption in the state should contain no other substances than those defined by the act. It was competent for the State Legislature to devise some reasonable and practicable method of ascertaining and evidencing the fact of a compliance with this requirement. In the case of a domestic manufacturer, as conceded at the hearing, the inspector goes to the brewery and makes his test by "taking a sample of the mash and of the beer that they are fermenting. This method would not in the slightest manner interfere with or hinder them in their operations, and would at the same time enable the inspector to inspect hundreds and thousands of gallons of beer from the one sample; for as the mash is, so must the beer be." It is impracticable for the state to send and maintain an inspector at every outside brewery, to make an inspection and test. Hence, in respect of the foreign shipper, the Legislature had recourse to the acceptance from him of an affidavit evidencing a compliance with the requirements as to the ingredients of the imported article. It would most certainly seem that, if this were all, the importer ought not to complain. The chief objection to accepting such ex parte evidence of the purity of the imported article might, with great propriety, be made by the con-

sumer. Such evidence might be very unreliable and afford little protection. The state, having no extraterritorial jurisdiction, could not proceed against the nonresident importer for a violation of its penal statute; and, singularly enough, the statute does not undertake to impose any penalty upon the agent or representative of the foreign manufacturer for presenting in this state to the inspector a false affidavit. I suspect that the Legislature was more concerned in the matter of obtaining fees, to swell the exchequer of the state, than in the protection of the people who might drink beer. If, however, such affidavit be accepted by the state as sufficient evidence, it certainly ought not to lie in the mouth of the importer to complain that the trouble of making, on a stereotyped form, such perfunctory statement, and the inconsiderable fees likely to be paid therefor, enable him to stand on an equal footing with the domestic manufacturer, who is compelled to admit to his premises the inspector to make an actual test of every tub of mash, and to follow it with labels on the receptacles into which it is placed for sale. It seems to me, in this respect, that the law is rather a discrimination in favor of the importer. Law is intended to be a sensible and practicable thing, and therefore it recognizes distinctions growing out of different situations; and different rules may be made respecting different classes, where classification is a result arising ex necessitate rei. The equality of right exacted by the Fourteenth amendment to the federal Constitution is only that the laws "shall operate on all alike under the same circumstances." Clark v. City of Titusville, 184 U. S. 333, 22 Sup. Ct. 382, 46 L. Ed. 569.

Further objection to said section 5, in this connection, is the contention that, in addition to such affidavit, the inspector is required to make an inspection of each package containing beer; that such inspection implies a physical opening of at least one bottle in each package containing beer in bottles, and when in kegs or barrels the opening and taking therefrom a sufficient quantity to sample, which would involve the destruction and loss of the article so opened, as it is a well-known fact that beer when thus opened becomes stale and unsalable. Reading the phrase in section 5, "upon receipt of said affidavit the inspector shall inspect and label the packages containing said beer or malt liquor," in connection with sections 7 and 8, which impose upon the inspector the duty of causing to be inspected all beer or other malt liquors brewed or manufactured or sold in this state, to determine its ingredients, gives color to the contention that a physical inspection of the imported beer for sale in the state, in the mind of the Legislature, is as much required as in the case of the domestic manufacturer. It must be conceded that the Supreme Court of the state, in passing upon said section 7, in respect of the domestic manufacturer, was placed in distress in upholding the validity of the statute to avoid a construction that seemingly required a physical opening of the package after it was put up by the brewer for sale, by holding that it was contemplated the inspection should be made of the mash or fermented beer at the brewery before it passed into the packages or receptacles for sale. The court felt compelled to resort to this judicial coup d'état to avoid

the criticism that such mode of inspection involved a physical destruction of a part of the property of the owner, without making any provision for just compensation therefor, and thus taking private property without due process of law; and further to escape following the recognized rule that, in determining the validity of a legislative act, the question is, what do its terms authorize to be done under them? rather than what is done under them. But, as already shown, the mode of inspection suggested by the state Supreme Court respecting the inspection of domestic beer would be quite impracticable in the case of beer manufactured outside of the state. Evidently it was contemplated by the Legislature that the phrase, "upon the receipt of said affidavits the inspector shall inspect and label the packages," should imply that the inspector is merely to inspect the same thing he labels, i. e., the package; that it was intended that the affidavit should take the place of inspecting by test the ingredients of the package, and that the inspection to be made by him is only to see that the packages labeled correspond with those covered by the affidavit. And I doubt not that, as stated by defendants' counsel at the hearing, this is the course in fact pursued by the inspector.

Is this construction given by defendants' counsel to this clause of section 5 unreasonable, or too artificial? Why should the Legislature provide that the importer alone should furnish an affidavit, giving the constituent elements of his product, if that were to be followed up by a physical test, by sample, of each package? The affidavit under such construction could perform no reasonable office. It would be wholly a work of supererogation. A physical inspection by opening the packages would not only disclose all that the affidavit gives, but would furnish all the safeguard the state could want. In construing statutes, courts should not exhibit an eagerness to find flaws, nor prefer that hypercritical, technical import of a term which would reduce the statute to a legal absurdity, rather than that which, while giving a sensible office and meaning to the context, will preserve the consistency and efficiency of the law. As said by Mr. Justice Field, in U. S. v. Kirby, 7 Wall. 486, 19 L. Ed. 278:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will, always, therefore, be presumed that the legislature intended exceptions in its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

The bill of complaint does not in terms charge that the inspector has ever attempted to open the imported packages with a view of making an analysis of the contents of a single bottle or cask, or that he threatens to do so. I should not hesitate to interpose by injunction to protect the importer of beer against a rule of inspection which would destroy a valuable part of the shipper's property without just compensation therefor to the owner. The ultimate position of complainant's counsel is that, the state recognizing the traffic in intoxicating liquors, imported beer stands upon the same footing as any other article or commodity of merchandise brought into the state; and the state may not, under the guise of inspection fees as a police regulation, subject it to onerous exactions bearing no just rela-

tion to the expenses attending such inspection. The Supreme Court of the United States has repeatedly said, in discussing the interstate commerce clause of the Constitution, that "the mere fact that an act purports to be an inspection measure is not conclusive upon the court; its purposes and objects must be determined by its natural and reasonable effect. The court is not to be misled by mere pretenses." Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632; Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862, 34 L. Ed. 455. That court has also said that "a burden imposed by a state upon interstate commerce is not to be maintained simply because the statute imposing it applies alike to the people of all the states, including the people of the state enacting such statute." Railroad Co. v. Husen, 95 U. S. 465, 24 L. Ed. 527.

The case at bar, however, is to be determined by its relation to the act of Congress of 1890 (26 Stat. p. 313 [U. S. Comp. St. 1901, p. 3177]), known as the "Wilson Bill," which declares—

"That every fermented, distilled or other intoxicating liquors or liquids transported into any state or territory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such state or territory, be subject to the operation and effect of the laws of such state or territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such state or territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

Counsel for complainant are in error in asserting that this act has application alone to states maintaining prohibition laws. Color is given to this contention by certain language employed in the opinion in Scott v. Donald, supra. But in the later case of Vance v. W. A. Vandercook Co., 170 U. S. 438, 18 Sup. Ct. 674, 42 L. Ed. 1100, that language is explained, and its application properly limited. The court said:

"The plain purpose of the act of Congress having been to allow state regulations to operate upon the sale of original packages of intoxicants coming from other states, it would destroy its obvious meaning to construe it as permitting the state laws to attach to and control the sale only in case the states absolutely forbade sales of liquor, and not to apply in case the states determined to restrict or regulate the same. * * * If the purpose of the act had been to allow the state law to govern the sale of the original package only where the sale of all liquor was forbidden, this object could have found ready expression, whilst, on the contrary, the entire context of the act manifests the purpose of Congress to give to the respective states full legislative authority, both for the purpose of prohibition as well as for that of regulation and restriction with reference to the sale in original packages of intoxicating liquors brought in from other states. * * * Such a law may forbid entirely the manufacture and sale of intoxicating liquors and be valid. Or it may provide equal regulations for the. inspection and sale of all domestic and imported liquors and be valid. But the state cannot, under the Congressional legislation referred to, establish a system which, in effect, discriminates between interstate and domestic commerce in commodities to make and use which are admitted to be lawful."

Laws for protecting the people against impure food, adulterated milk and butter, decayed vegetables, and unwholesome ingredients in intoxicating liquors inhere in the police power of the state. The fact that a large revenue may incidentally result is not fatal to such a law, especially in respect of intoxicants. In the very nature of the

case, the amount of the license fee must rest in the sound discretion of the legislative branch of the government. As said by Mr. Justice Catron, in The License Cases, 5 How. 504–599, 12 L. Ed. 256:

"The assumption is that the police power is not touched by the Constitution, but left to the states as the Constitution found it. And this is conceded; and whenever a thing, from character and condition, is of a description to be regulated by that power of the state, then the regulation may be made by the state, and Congress cannot interfere."

Subject, of course, to the ascertainment by the federal courts, in a proper case, as to whether or not the thing be within the essential police power of the state.

This character of legislation is bottomed upon the postulate, in this country, that the right to sell intoxicants is not a natural right. Hence it is universally recognized that the state may prohibit entirely its sale within its territory, or it may grant permission to sell under such restrictions and regulations as the lawmaking department, in its wisdom, may see fit to impose. And so long, under the statute, as the regulation and exaction are free from unequal discrimination against products the subject of interstate commerce, this complainant is without legal grievance. The large yield to result to the state from the inspection fees, exacted beyond the cost of executing the law, is supported by that eminent jurist, Judge Cooley, who said:

"It is proper and reasonable to take into account not only the expense merely of direct regulation, but all the incidental consequences which may be likely to subject the public to cost in consequence of the business licensed. In some cases the incidental consequences are much the most important, and, indeed, are what are principally had in view when the fee is decided upon. * * * The business of selling intoxicating liquors has a powerful tendency to increase crime and pauperism. It renders a large force of peace officers essential, and it adds to the expenses of the courts, and of nearly all branches of civil administration. It cannot be questioned, therefore, if it is to be licensed by the public authorities, that it is legitimate and proper to take into account all the probable consequences, or that the payment to be exacted should be sufficient to cover all the incidental expenses to which the public are likely to be put by means of the business being carried on." Cooley, Tax'n (2d Ed.) p. 599; State v. Ludington, 33 Wis. 107.

It is upon this theory that high license laws of the state are upheld.

"Such laws are regarded 'as police regulations, established by the Legislature for the prevention of intemperance, pauperism, and crime, and for the abatement of nuisances,' and are not regarded as an exercise of the taxing power. 'Pursuits that are pernicious and detrimental to public morals may be prohibited altogether, or licensed for a compensation to the public.' It does not follow because the license fee is large, or because it may become a part of the public revenue, that it is, therefore, a tax." State ex rel. Troll v. Hudson, 78 Mo. 302, loc. cit. 304, 305.

It must be held, however, that the demurrer to the bill is too broad. In the second subdivision of the eleventh paragraph of the bill it is alleged—

"That in the usual course of its (complainant's) business in such commerce it is compelled to and does maintain large warehouses and storerooms in the state of Missouri, and is compelled to and does maintain an office therein as a necessary adjunct to the proper and economical conduct of its said business and commerce; that, of the beer imported annually into the state of Missouri by your orator, a great portion, to wit, not less than seventy-five

hundred barrels, of 31 gallons each, of the aggregate value of fifty thousand dollars ($50,000) is intended for export to other states. That, in the due course and conduct of its said business, such beer is unloaded by your orator from the cars in which it has been imported into the state, and is stored, in unbroken bulk, and in the original packages in which the same was imported, in the storehouses and warerooms of your orator in the state of Missouri. That sales of such imports, in the unbroken and original packages in which imported, are thereafter effected by your orator, in the state of Missouri, to persons resident without and noncitizens of the state of Missouri, for export by your orator therefrom, and for delivery by your orator, in such original packages, to the purchasers thereof at agreed points in other states and countries; that such imports of your orator, when so sold, are thereafter exported from the state of Missouri by your orator, as aforesaid, and no part or portion thereof is consumed within the state; that, upon such imports so thereafter by your orator sold for export and so exported by your orator, your orator is compelled to pay, and, under protest, and in order to protect its property and rights from greater injury, does pay, to the state of Missouri—the same being exacted of your orator under the alleged authority of said enactment of the General Assembly—the sum of 39 cents per barrel as a tax, such payments, so compelled to be made by your orator, amounting in the aggregate to three thousand dollars ($3,000) or thereabouts annually; that, if such tax be not paid by your orator to said state, your orator's servants and agents will be apprehended, fined, and imprisoned as by said alleged enactment provided, to the great and irreparable injury of the business and property rights of your orator, and your orator's general license to carry on its business within the state will be revoked and annulled and no other license will be issued to it within a period of two years; in which event your orator's business within the state of Missouri will be wholly destroyed, and its property rights irreparably injured, and the defendants, and each of them, threaten to enforce against your orator, in the courts of the state, all of the penalties prescribed by said enactment for a breach of the provisions thereof, should your orator refuse to pay such assessments, charges, and taxes."

These facts stand admitted by the demurrer. As already maintained, the fifth section of the legislative act in question was intended to apply only to beer or malt liquors shipped into the state for use here. The right of the state to pass inspection laws, recognized in article 1 of section 10 of the Constitution, in the very nature of the reservation, is limited to the domestic products of the state, either for exportation or home consumption, or such as come into the state subject to the police power of regulation. "They act upon the subject before it becomes an article of foreign commerce or of commerce among the states, and prepare it for that purpose." Bowman v. Railway Co., 125 U. S. 488, 8 Sup. Ct. 689, 31 L. Ed. 700; Gibbons v. Ogden, 9 Wheat. 203, 6 L. Ed. 23. It has no reference to and cannot touch foreign manufactures which become subjects of interstate commerce in passing through the state, or which may be temporarily stored here for distribution in the original bulk or package in transitu to another state. In the recent case of Attorney General ex rel. v. Great Western Tea & Coffee Co. of St. Louis (decided by the Supreme Court of this state) 71 S. W. 1011, respecting the right of the company importing baking powder into the state, it was held that the statute of this state, eliminating from the manufactured article alum as an ingredient, is not applicable to the foreign manufactured powder imported into the state, while the act is valid as to the article manufactured in the state. This distinction evidently rests upon the proposition that such food product,

being a natural subject of interstate commerce, is not subject to such police regulation of the state. I assume this to be the distinction drawn by the court between the baking-powder case and the beer case heretofore decided by that court, though I have not seen the full report of the recent case. The police power, dependent in the case at bar for its exertion upon the idea that it is essential for the protection of the health and good of the people of the state, its exercise can have no foundation of right, even as applied to intoxicants not manufactured in the state, and not to be consumed or used in the state. To subject the foreign product in its passage through the state to any exaction by the state, either by way of taxation or inspection fees, would be a direct interference with interstate commerce. So that, if the complainant's beer or malt liquor not shipped into this state for sale is subjected to the conditions and annoyances to the complainant, or its agents or servants, in the manner alleged in that part of the bill above quoted, it invites and justifies the interposition of the injunctive process of the court. This jurisdiction is supported by the recent decision of the Court of Appeals of this circuit in the case of City of Hutchinson v. Beckham, 118 Fed. 399. In that case an ordinance of the city of Hutchinson, Kan., was assailed on the ground that it undertook to impose a license tax upon complainants' goods shipped from Missouri, and stored for distribution in complainants' warehouse in the city of Hutchinson, when no like exaction was made of other merchants engaged in local business, or of those who did maintain their principal office there, etc. The ordinance imposed fines, and exposed the offender to arrest and imprisonment. It was alleged that such criminal proceedings had been instituted, and the city threatened to continue such prosecutions, to the great annoyance and injury to complainants in the pursuit of their rightful business as importers of interstate commerce. Thayer, Circuit Judge, said:

"Now, conceding that the validity of the ordinance might have been tried in any one of the criminal prosecutions thus brought by the city, yet, as the right of appeal existed from any judgment which might have been rendered therein, it is apparent that months, and possibly some years, might have elapsed before the invalidity of the ordinance would have been definitely established, and that in the meantime the complainants might and probably would have been compelled to defend a multitude of suits, and submit to daily interruptions of their business, which would have proven to be very annoying, and probably disastrous. In such a case, the rule that a suit in equity will not lie to restrain the collection of an illegal tax, merely on the ground of its illegality, does not apply, because circumstances are alleged which show that if left to their remedy at law the complainants would probably be subjected to numerous prosecutions, besides sustaining great and irreparable loss in the prosecution of their business. When, in addition to the fact that an illegal tax has been imposed, it further appears that the persons or corporations upon whom it is imposed will be called upon to defend a multitude of suits, or that they will sustain great injury if the state or municipality is left free to enforce the tax by the usual remedies, courts of equity never hesitate to assume jurisdiction and grant injunctions against those who are seeking to enforce the collection of the tax, if it appears to be clearly illegal." Dows v. City of Chicago, 11 Wall. 108, 110, 20 L. Ed. 65; Railway Co. v. Cheyenne, 113 U. S. 516, 525, 5 Sup. Ct. 601, 28 L. Ed. 1098; City of Ogden v. Armstrong, 168 U. S. 224, 239, 240, 18 Sup. Ct. 98, 42 L. Ed. 444; Heywood v. City of Buffalo, 14 N. Y. 534.

As the demurrer goes to the whole, if any part of the bill be good, the demurrer must be overruled. As the defendants will have leave to answer, they can put in issue said allegations, if untrue, and any other matters of fact alleged in the bill they may deem proper to controvert.

It results that the demurrer must be overruled.